*Pirtle & Speed* for plaintiff.

----

## Turneys *vs* Hunt, &c.

### ERROR TO THE BOURBON CIRCUIT.

*Assignor and assignee. Substitution. Equity. Usury. Parties.*

CHANCERY.

Case 96.

July 12.

Case stated.

JUDGE BRECK delivered the opinion of the Court.—This opinion was delivered on the 31st of January, 1848, but suspended until the 12th July thereafter—Judge Simpson did not sit in the case.

IN September, 1841, Miller & Son executed their two notes to Amos and Mathew Turney, one for $2,500, and the other for $947 22, each payable on the 1st March following. The small note was paid off by Miller & Son at maturity or shortly afterwards. The large

note was assigned, by the Turneys, to Tolls, and by him to Hunt, who having obtained a judgment thereon, Miller & Son filed this bill in chancery, alledging that there was included in the note about $2,000 of usury, and to that extent enjoined the judgment.

Hunt answered, denying any knowledge of the usury, and made his answer a cross bill against Miller & Son, and also against the Turneys, alledging that the former had notice of the assignment to him of the large note before the maturity or payment by them of the small one, and therefore, to that extent, that his judgment ought not to be affected by the alledged usury.

He also alledges that his assignor, Tolls, is insolvent, and claims, in the event the usury should be established, a decree against the Turneys, to the extent that his judgment might, on that account, be perpetually enjoined.

The Turneys, in answer to the complainant's bill, controvert, to some extent, the usury.

In answer to the cross bill of Hunt, they deny their liability to him in any event, and set up against their assignee, Tolls, his note to them for $2,283, dated 1st March, 1842, and payable one day after date; also, his two other notes, amounting to near $10,000, of which they claim as assignees, to be the proprietors. They deny that they had any notice or knowledge of the assignment of the $2,500 note to Hunt, before they obtained the notes upon Tolls, upon which they rely, and which they alledge were executed, and the two last named assigned to them, for a valuable consideration. They alledge that they are all unpaid, and seek to set off so much thereof against any claim their assignee, Tolls, may have against them, should the complainants succeed in establishing their claim for usury.

The Court below was of opinion that there was usury embraced in the two notes of the complainants to the Turneys, to the amount of $1,850, which should be apportioned between them. It was accordingly decreed that the Turneys pay the complainants $508 38, the usury in the small note, which they had paid off, and taking that sum from the whole amount of the usury,

their injunction was perpetuated for the residue, being $1,341 75.

The Court was also of opinion, that by the assignment of the note by the Turneys to Tolls, there was an implied guaranty on the part of the former, of the validity of the debt, and the legality of its consideration, which passed in equity by the assignment of Tolls to Hunt; and as the assignment to Hunt was before the Turneys obtained their notes upon Tolls, they could not render them available against the claim of Hunt. The Court accordingly decreed that the Turneys should pay Hunt the $1,341 75, as to which sum his judgment against Miller was perpetually enjoined.

The Turneys have brought the case to this Court and contend that the decree is erroneous upon the following grounds:

Questions made
by the assign-
ment of errors.

1st. As to the amount of usury for which they are made responsible.

2d. In decreeing them to pay any portion of it to the complainants.

3d. In decreeing them to pay any portion of it to Hunt.

4th. Because the proper parties were not before the Court.

The validity of the first objection rests upon the following facts:

In 1834 or 1835, Amos Turney loaned, of his own funds, to Steele and Joseph Miller, trading under the firm of Steele & Miller, about $2,500. This sum was annually compounded at an usurious rate of interest, till 1839, when the whole sum due, including legal and usurious interest, and after deducting some credits, amounted to near $4,000. At that time a note for the sum then due, was executed to Amos and Mathew Turney, payable in twelve months, and a separate note for the interest, at the same exorbitant rate, was also executed; and from that time the fund was managed by the Turneys jointly. These notes, executed in 1839, were given by the firm of Miller & Son, or Joseph and James A. Miller, the former having been a member of the firm of Steele & Miller, which had been dissolved.

TURNEYS
*vs*
HUNT, &c.

Under these circumstances it is insisted that in ascertaining the usury the Court erred in going behind the notes of 1839. That the entire debt due by Steele & Miller to A. Turney, was in effect paid by the note of Miller & Son to the two Turneys, and that they had received credit for the sum thus assumed, with the firm of Steele & Miller; and consequently, that the former firm had no right to reclaim usury thus paid by the latter.

The objection is very clearly untenable. In the first place, no usury had, in point of fact, been paid by Steele & Miller. It is true some payments had been made by them, but so far from paying the usurious, the payments did not extinguish the legal interest. But Joseph Miller was bound to pay the debts of Steele & Miller, as a member of that firm. He undertakes to pay them with the note of Miller & Son. Whether that firm had stipulated to discharge the debts of Steele & Miller, or whether Joseph Miller, with his new partner as surety, had assumed their payment, is wholly immaterial. It was the debt of Joseph Miller in 1839, or he was bound for the same before the execution of the notes of Miller & Son. It was still his debt as a member of the firm of Miller & Son. The substitution of James A. Miller in the place of Steele, did not free the transaction from usury; nor was the firm of Miller & Son, or either member of it, estopped from relying upon it; and so far as that firm had stipulated to pay and had paid usurious interest, it had an undoubted right to reclaim it. They were only bound to pay so much of the debt to the Turneys as was just. Nor did the fact that the notes in 1839, and afterwards were made payable to Amos and Mathew Turney, vary the case or affect the right or extent, to which the complainants were entitled to relief.

Mathew Turney did not become a partner of Amos in the debt, or interested in it, if such were the fact, at the instance or by any representations of Miller & Son. He does not alledge that he was ignorant of the large amount of usury included in it, or that he was deluded by any assurances by Miller & Son, that the usury would be paid; nor does he even alledge that the note

Payments made in discharge of a note given for usurious interest to the original payee of the principal debt, are not payments upon the principal debt then in the hands of an assignee by assignment and notice.

was made payable to Amos Turney and himself, by reason of any purchase by him of one half, or indeed any portion of it for a valuable consideration.

It seems to us, therefore, that the complainants could set up the same equity against both the Turneys, that they could have done against Amos alone, had the transaction been continued in his name, and that they are entitled to the same relief as to the usury included in the transaction prior to 1839, that Steele & Miller would have been entitled to, had they both continued bound upon the subsequent notes. As to the amount of the usury embraced in the two notes of September, 1841, we are entirely satisfied the decree is right. Whether Mathew Turney has any claim upon Amos on account of the usury included in the debt prior to 1839, is a matter exclusively between them, and which we are not called on to decide.

*If a note payable to A. be renewed by a note to A. and B., the debtor has the same equity against the last named payees as he had against the first, when there was assurance given to B. nor fraud..*

2. It is contended that the complainants had a right to pay off the small note, and that the amount thus paid was an extinguishment of so much of the debt and legal interest, and not a payment of any portion of the usury, and should be so treated. This position would undoubtedly have been correct, if the Turneys had, at the time, held both notes. But as Hunt had become the legal proprietor of the $2,500 note, and of which the complainants had notice before this payment was made, they could not by paying, nor could the Turneys by receiving, affect the right of Hunt, as they existed at the time the complainants had notice of his claim. The two notes were given for one and the same debt. The aggregate amount was the balance due the Turneys, including usury, upon a settlement made at the time the notes were executed. Why two notes were given, both payable at the same time, instead of one, does not appear. But both notes evidenced the amount then ascertained to be due.

*Payments made over the legal interest should be applied so far to extinguish the principal debt, if held by the payee, but if assigned and notice thereof, it does not operate as a payment when made to the assignor.*

The Turneys transferred the $2,500 note to Tolls, as a valid debt due them by the complainant. But the complainants only owed them, in equity and good conscience, at the time, $1,597 22, all the residue of both notes being usury. The note was not then for a valid

debt as to the whole amount, but as the complainants justly owed the $1,597 22, the question arises whether it should not be considered good to that extent; whether the Turneys should not be regarded as transferring the valid and not the unconscientious portion of their debt. The assignment was in effect an order upon the complainants to pay the assignee $2,500. If they did not owe that amount, it was, nevertheless, a transfer and appropriation to the extent they did owe. After notice that Hunt had become the proprietor of the note—that the debt which they justly owed the Turneys, and more too, had been transferred to him, and that the Turneys had, in effect, directed them to pay him that amount, could the complainants, in good conscience pay, or the Turneys receive any portion of the $1,597, which, and which alone, was justly due from the former to the latter? It seems manifest to us, that equity and good conscience would forbid it. In the payment to the Turneys, therefore, after notice of the claim of Hunt, the complainants must be regarded as paying and the Turneys as receiving, not the valid debt, nor any portion of it, but the usury. The Turneys would have no more right, in an equitable point of view, to collect or receive any portion of the actual valid debt due them by the complainants after the transfer to Tolls, than they would to receive payment of a note after they had parted with it by assignment; nor would the complainants have any more right to pay to them than they would have to pay their note to the payee after notice that it belonged to an assignee.

It results from this view of the case, that there is no error in the decree to the prejudice of the Turneys, in directing them to refund to the complainants $508 38, part of the $947 note paid off by them after notice of the claim of Hunt. They should, in our opinion, have been decreed to refund the whole amount so paid them, so that Hunt might have realized his judgment to the extent of the $1,597 22.

3. It is objected that the Court below erred in decreeing the Turneys to pay Hunt $1,341, the residue of the usury after deducting the amount which they

had been decreed to refund to the complainants, and this, we think, is a valid objection.

The cross bill of Hunt alledges that his assignor, Tolls, was hopelessly insolvent, and seeks relief against his assignors, the Turneys. In view of this branch of the case, the question arises in regard to the jurisdiction of a Court of equity.

We are not aware that this question has been expressly settled by this Court. In *McFadden* vs *Finnell, &c.* (3 *B. Monroe*, 121,) it is decided that the last assignee, his immediate assignor being a non-resident, has an equitable right to proceed against the first assignor, making all the intermediate assignors defendants. In that case the Court say: "The jurisdiction of the Chancellor cannot be seriously doubted. Finnell's absence authorized a bill against him and the resident assignors, who were equitably liable to him and McFadden. And besides, in such a case of multifarious assignments and liabilities, the last *assignor* has an equitable right to proceed against the first by making all intermediate assignors parties, and thus prevent injurious circuity, multiplicity and delay."

When a note has been several times assigned and the last assignor is insolvent or non-resident, and his assignor is a resident, the Chancellor may substitute the last assignee to the equitable right of his assignor to recourse against this assignor: *McFadden* vs *Finnell*, (3 *B. Monroe* 121.)

But the question was expressly decided by the Supreme Court in *Riddle & Co.* vs *Mandeville and Jamison*, (2 *Condensed Reports*, 267,) and that case was decided in view of the laws of Virginia in regard to the assignment of promissory notes, and which were similar to those of Kentucky.

*Riddle & Co.* vs *Mandeville and Jamison*, (2 *Con. Rep.* 267,) cited with approbation, as sustaining the same principle.

In that case the last or immediate assignor was alledged to be insolvent. The Chief Justice, who delivered the opinion, says: "The maker having proved insolvent, the plaintiffs have a legal right to claim payment from McClenachan, (their endorser;) and, on making that payment, McClenachan would be re-invested with all his original rights in the note, and would be entitled to demand payment from Mandeville and Jamison." If then, twenty successive endorsers of a note, this circuitous course might be pursued, and by the time the ultimate endorser was reached, the value of the note would be expended in the pursuit, this circumstance would afford a strong reason for enabling

Turneys
vs
Hunt, &c.

the holder to bring all the endorsers into that Court, which could, in a single decree, put an end to litigation. No principle adverse to such a proceeding, is perceived. Its analogy to the familiar case of a suit in chancery by a creditor against the legatees of his debtor, where the executor has distributed the estate, is not very remote.

If doubts of his right to sue in chancery could be entertained while the executor was solvent, none can exist where he had become insolvent, &c.

In the present case as in that which has been stated, the insolvency of McClenachan furnishes strong additional motives for coming into a Court of chancery. Mandeville and Jamison are ultimately bound for this money, but the remedy at law is defeated by the bankruptcy of an intermediate endorsee. It is only a Court of equity which can afford a remedy."

But the opinion goes further and rests the jurisdiction and the right of the complainants to relief, upon the ground that the implied promise or undertaking of the first endorser had been transferred, in equity, by the second assignment to the holder of the note or last endorsee ; and that equity would, of course, afford a remedy.

Bank U. S. vs
Weisiger,      (2
Peters, 332,) cited as sustaining the same principle.

In the *Bank of the United States* vs *Weisiger*, (2 *Peters*, 332,) which afterwards went up to the Supreme Court from Kentucky, and was decided in reference to our laws, the jurisdiction was sustained upon the authority of the case of *Riddle & Co.* vs *Mandeville and Jamison*. In that case there was no allegation of the insolvency of the intermediate or last assignor. The jurisdiction seems to have been sustained and relief granted, upon the ground and upon that alone, that the first endorser was responsible, when the maker of the note had, with due diligence, been prosecuted to insolvency. But whether, in the case before us, a Court of equity would have had jurisdiction without the insolvency of Tolls, it is not necessary and we do not decide. In view of that fact, however, we are satisfied the jurisdiction should be sustained.

Does the claim
of a previous as-

The next question for consideration then is, whether the demands set up by the Turneys against their as-

signee, Tolls, constituted an available defence against the claim of Hunt.

In the cases to which we have referred, there were no intervening equities and no question of this kind arose.

Upon the assignment of the note by the Turneys to Tolls, the law implied an assumpsit from the former to the latter, to pay or refund the consideration of the assignment, should payment, after due diligence, not be obtained from the maker.   There was, also, an implied warranty on the part of the Turneys as to the title of the note, and that it was valid and given for a legal and sufficient consideration.   There was, also, the same assumpsit and warranty by Tolls upon his assignment to Hunt.

The Court below was of opinion that Tolls also, by his assignment to Hunt, in equity, transferred to him the implied assumpsit and warranty of the Turneys to him, and thereby left himself without any claim either legal or equitable.   And as his assignment to Hunt was before they acquired their demand against him, there was nothing in his hands and he had no claim for their demands to affect; and consequently, that they could not be rendered available to defeat the claim of Hunt. We are not of opinion this proposition can be sustained, and clearly not in its fullest extent.   We are aware of no case in which these principles have been recognized in Kentucky, and we are not satisfied that such is or has been the popular understanding in reference to the assignment of notes of this kind.   On the contrary, we are inclined to the opinion that the general understanding is, that each assignee looks to his immediate assignor for indemnity and protection, should the maker of the note prove insolvent; and that by his assignment he does not part with his right of recourse upon his assignor, but retains it.   In regard to the implied warranty as to the title of the note and the consideration, cases, we think, may readily be supposed, in which an assignor, after he transferred it, and before there had been any judicial decision in regard to it, might resort to his remedy against his assignor.   Suppose the note

---

*Margin notes:*

TURNEYS
vs
HUNT, &c.

signor against his immediate assignee, constitute a valid equity against the last assignee who seeks to hold the previous assignor responsible?

There is an implied warranty on the part of every assignor of a note, that it is genuine and upon good consideration.

Does the implied assumpsit and warranty of the genuineness, and that the note is upon good consideration, pass in equity to each assignee to whom it is assigned.—QUERE.

was a forgery, or for other reasons was utterly void, or that it had been fully paid off and discharged, would not an assignee have an immediate remedy against his assignor? In such cases the note would be utterly worthless, it would not be necessary to restore it.

But we are not satisfied that the right of the last assignee to reach a remote assignor, rests upon the ground that he has acquired the right of recourse of every intermediate assignor. For if that proposition were true, he might recover in equity, from the first assignor, a much larger sum than he was entitled to recover from his immediate assignor. In the case before us, suppose the consideration of the assignment from the Turneys to Tolls was $2,000, and of the assignment from Tolls to Hunt $1,500. The measure of Hunt's recovery at law against Tolls, would be $1,500. Could he recover more than that in a Court of equity? We think not. But if the position be true that he is entitled to the entire recourse of Tolls, he would be entitled to recover $2,000. Hunt seeks relief in equity, because his remedy at law against Tolls is wholly unavailing on account of his insolvency, and because the Turneys are responsibl to him as assignors. But when Hunt comes into a Court of equity, he asks in effect, to be substituted to the rights of Tolls against the Turneys. Tolls is a necessary party, and may well contend that their right to substitution cannot exceed the amount of their claim against him. To that extent only, has he been injured, and that far only would he be entitled, in any event, to relief. The consideration for the assignment, paid by Tolls, being, as he supposed, $2,000, he would equitably be entitled to the overplus against the Turneys, after satisfying the claim of Hunt. If then the right of Hunt to resort to a Court of equity for relief against the Turneys does not rest upon his having obtained, by the assignment, the recourse of Tolls upon them, but upon Tolls' insolvency, and the right, in effect, by substitution to his rights to make them, it would follow, we think, that their equity against Tolls would be available against the claim of Hunt; and this principle seems to be recognized in *Riddle & Co.* vs *Mandeville and Jami-*

The last assignor cannot recover more from any previous assignee, than he would be entitled to recover against his immediate assignor and his immediate assignor is a necessary party.

*son.* In that case the Court say, the defendant, the first assignor, sustains no injury for he may defend himself in equity, against the holder as effectually as he could defend himself against his immediate assignee in a suit at law.

It results, from the view we have taken, that the decree is erroneous. Tolls was also a necessary party, and not being brought before the Court by Hunt, the decree on that account, should also be reversed.

Wherefore, the decree is reversed and the cause remanded, with directions to render a decree perpetuating the complainant's injunction as to so much of the usury as remains after deducting the amount paid the Turneys upon the small note of $947, and as to the residue, to dissolve it with damages; and as to the amount so paid upon the small note, the Turneys will be decreed to pay the same to the complainants, with interest from the time they filed their original bill.

As to the cross bill of Hunt, he will be permitted to amend his pleadings and bring Tolls before the Court, and for further proceedings consistent with this opinion.

*J. & W. L. Harlan and G. Davis* for plaintiffs; *Robinson & Johnson and Hawes* for defendants.